1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    HEATH ELLIOTT CAIN,

11          Petitioner,                    No. CIV S-02-1191 LKK DAD P

12    vs.

13    MATTHEW C. KRAMER, et al.,

14          Respondents.              <u>FINDINGS & RECOMMENDATIONS</u>

15    _____/

16          Petitioner is a former state prisoner proceeding pro se with an application for a

17    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction on

18    charges of false imprisonment by violence or menace, with an enhancement for personal use of a

19    firearm; second degree robbery; assault with a deadly weapon; and second degree burglary, with

20    an enhancement for personal use of a knife.  Petitioner seeks relief on the grounds that: (1) his

21    rights to due process and a fair trial were violated when the trial court denied his motions to

22    dismiss and for a new trial because of the prosecutor's failure to disclose exculpatory evidence to

23    the defense; (2) his rights to due process and a fair trial were violated when the prosecutor

24    commented during closing argument on petitioner's failure to testify and when the trial court

25    denied petitioner's motion for new trial on this basis; (3) the trial court's refusal to instruct the

26    jury with a special instruction requested by the defense deprived petitioner of his right to have the

jury determine every material issue presented by the evidence; and (4) the prosecutor committed misconduct during jury voir dire when he made an assertion of judicial authority.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL BACKGROUND

On December 10, 1998, an information was filed in the Shasta County Superior court charging petitioner with: (1) attempted murder of Donna Schulte, a serious felony, in violation of Cal. Penal Code §§ 664, 187, and 1192.7(c) (count 1); (2) kidnap of Donna Schulte with use of a firearm, a serious felony, in violation of Cal. Penal Code §§ 207(a) and 1192.7(c) (count 2); (3) assault with use of a firearm on Donna Schulte, in violation of Cal. Penal Code § 245(a)(2) (count 3); (4) second degree robbery of Paul McKune, a serious felony, in violation of Cal. Penal Code §§ 211 and 1192.7(c)(19) (count 4); (5) assault with a deadly weapon on Paul McKune, causing great bodily injury, a serious felony, in violation of Cal. Penal Code §§ 245(a)(1) and 1192.7(c)(23) (count 5); and (6) second degree commercial burglary, in violation of Cal. Penal Code § 459 (count 6).  (Clerk's Transcript on Appeal (CT) at 126-30.)  It was also alleged that: (1) petitioner personally used and discharged a firearm during the commission of the crimes charged in counts 1 and 2; and (2) petitioner personally used a deadly and dangerous weapon (a knife) during the commission of the crimes charged in counts 4, 5, and 6.  (Id.)  On December 14, 1998, petitioner was arraigned.  (Id. at 441.)  He entered a plea of not guilty and denied all special allegations.  (Id.)

Jury trial commenced on April 20, 1999.  (Id. at 585.)  On May 20, 1999, petitioner's jury found him not guilty of attempted murder (count 1) and kidnapping (count 2).  (Id. at 838.)  The jury found petitioner guilty of the lesser included offense of false imprisonment of Donna Schulte by violence or menace with personal use of a firearm; assault with a firearm on Donna Schulte; second degree robbery of Paul McKune; assault with a deadly weapon (a knife) on Paul McKune; and second degree burglary of a commercial building.  (Id.)  On June 7, 1999,

petitioner filed a motion seeking a new trial on the grounds that: (1) the prosecutor violated

discovery rules and committed Griffin error; (2) his trial counsel rendered ineffective assistance;

and (3) his conviction of false imprisonment should be modified to a misdemeanor.  (Id. at 892-

99.)  The trial court denied the motion for new trial on June 17, 1999.  (Id. at 926.)  On July 8,

1999, petitioner was sentenced to an aggregate term of seven years in state prison.  (Id. at 944-

45.)

On July 21, 1999, petitioner filed a timely notice of appeal.  (Id. at 951.)

Petitioner's conviction was affirmed by the California Court of Appeal in an unpublished opinion

dated August 22, 2001.  (Answer, Ex. 1.)  On October 3, 2001, petitioner filed a petition for

review in the California Supreme Court.  (Answer, Ex. 2.)  That petition was summarily denied

by order dated December 12, 2001.  (Answer, Ex. 3.)  On June 3, 2002, petitioner filed a petition

for writ of habeas corpus in this court.

FACTUAL BACKGROUND[1]

Defendant and Donna S. dated each other for about three years.
During their romance, they frequented a local cemetery for private
time together.  In the summer of 1998 they were in the process of
ending their relationship when defendant became distraught.

He went to the cemetery alone the night of August 10, entertaining
thoughts of suicide.  Then, on August 11, he went to visit Donna,
who lived with her grandmother, mother, and sister.  Donna was
not home.  Her grandmother confiscated defendant's firearm and,
unable to unload it, lodged it in the cushions on the family sofa.
When Donna arrived home, defendant asked her to go swimming
in a nearby creek and agreed to allow her younger sister, Meco, to
accompany them.  He retrieved his gun before leaving.

The trio left in a truck owned by defendant and Donna.  He
allowed the driver of a Bronco to pass him, then chased that
vehicle and forced the driver to stop on a narrow country road.
Shirtless, but sporting his cowboy hat, he approached the Bronco
with his gun cocked.  The passenger, who knew defendant, pushed
the gun aside and watched defendant twirl the gun on his index

---

[1]  The following summary is drawn from the August 22, 2001, opinion by the California
Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-4, filed on
August 13, 2002, as Exhibit 1 to respondents' answer.

finger before sliding it into his waistband.  Donna, watching defendant's performance, grabbed the keys from the ignition and began to walk away.  She returned at his request and with his assurance that she could drive.  As they drove along, defendant began singing a strange song.

Defendant decided to return to the cemetery instead of the creek as planned.  Donna was hesitant because her younger sister was with them and she and defendant had always enjoyed the ambiance of the cemetery alone.  As she started to drive past the cemetery entrance, defendant reached over and attempted to turn off the ignition while pointing the gun toward the cemetery road.  Donna testified she was not afraid, nor did she feel threatened.  She followed his directions.  Once in the cemetery, defendant turned off the ignition, got out of the truck while holding the gun, and walked behind the truck to the driver's door.  He ordered Donna to get out.  She hesitated and grabbed the steering wheel.

Defendant broke her grasp and pulled her from the truck.  Meco remained in the back seat.  Defendant gave Donna a "little shove," prompting her to walk toward the rear of the truck, where they embraced.  Cheek to cheek, defendant held Donna against the truck and raised the gun alongside her temple.  In a brief moment, she heard the gun discharge and felt what seemed like a sledgehammer hitting her head and blood running down her neck.  Defendant was stunned; he looked shocked and surprised.  He told Donna, "[T]he bullet wasn't meant for you, it was meant for me."  He had planned to kill himself in front of her.

Defendant drove Donna to the hospital.  En route, he placed the gun in his mouth several times and threatened suicide.  Defendant had a knife, and he slashed his wrist.  He threw his cowboy hat, along with the gun, out the window onto Interstate 5.  He broke the front windshield of the truck.

Once at the hospital, defendant tried to obtain access to the pharmacy.  The pharmacist had already closed for the day.  Hearing a banging outside the pharmacy, the pharmacist started to raise the stainless steel roll-down door covering the service window when he saw a bloody arm, its hand grasping a knife, plunge through the small opening.  He jumped back to avoid being stabbed.  As defendant began to enter through the window, the pharmacist stepped forward to roll down the window but defendant raised the knife at him.  Defendant told him he did not want to hurt him.  The pharmacist fled.  Defendant slurped the contents of several medication bottles that were on the counter.

Defendant was charged with violent crimes against Donna and the pharmacist.  A jury acquitted him of the attempted murder, kidnapping, and assault of Donna but found him guilty of felony false imprisonment with the personal use of a firearm.  The jury

4

1  also found defendant guilty of burglarizing the pharmacy and
2  robbing and assaulting the pharmacist while personally armed with
   a knife.  He was sentenced to state prison for seven years.

3                              ANALYSIS

4  I.  Standards of Review Applicable to Habeas Corpus Claims

5          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

6  some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

7  861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

8  Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

9  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

10 Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

11         However, a "claim of error based upon a right not specifically guaranteed by the

12 Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

13 infects the entire trial that the resulting conviction violates the defendant's right to due process."

14 Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

15 Cir. 1980)).  See also Lisenba v. California, 314 U.S. 219, 236 (1941); Henry v. Kernan, 197

16 F.3d 1021, 1031 (9th Cir. 1999).  In order to raise such a claim in a federal habeas corpus

17 petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v.

18 United States, 368 U.S. 424, 428 (1962).  See also Henry, 197 F.3d at 1031; Crisafi v. Oliver,

19 396 F.2d 293, 294-95 (9th Cir. 1968).  Habeas corpus cannot be utilized to try state issues de

20 novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

21         Because this action was filed after April 26, 1996, the provisions of the

22 Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are applicable.  See Lindh v.

23 Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).

24 Section 2254(d) as amended by the AEDPA, sets forth the following standards for granting

25 habeas corpus relief:

26 /////

                                        5

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

II.  Petitioner's Claims

   A.  Brady Violation

Petitioner's first two claims involve alleged violations of the rule with respect to disclosure to the defense of exculpatory evidence set forth in Brady v. Maryland, 373 U.S. 83 (1963).  Petitioner's first claim is that his rights to due process and a fair trial were violated when the trial court denied his motion to dismiss based on the prosecutor's failure to disclose exculpatory evidence in a timely manner.  His second claim is that the trial court erred when it denied his motion for new trial on the same grounds.  The California Court of Appeal explained the background to these claims as follows:

Although not a prerequisite, defendant expressly requested disclosure of any audio tapes not already in his possession.  The prosecutor disclosed no additional tapes before trial.

Just before resting its case, the prosecutor disclosed one tape to the defense that contained a conversation between defendant and Donna, recorded at the jail nine days after the shooting.  The prosecutor testified that he decided to use the tape to rehabilitate Donna's testimony.  During cross-examination, defense counsel had suggested that Donna might have forged defendant's signature to enable her to sell their truck.  The tape contained a statement by defendant authorizing Donna to sell the truck.

The prosecutor ultimately disclosed 33 tapes.  His investigator had been aware that each of defendant's jail visits had been taped.  He

1    listened to the tapes as he received them; the prosecutor did not.

2    The court found a <u>Brady</u> violation and continued the trial to the
     following week to give the defense the opportunity to listen to the
3    tapes and adjust its trial strategy.  The prosecutor, a 17-year veteran
     district attorney, denied that he had willfully failed to disclose
4    material evidence.  Although the court concluded the failure to
     disclose was not made in bad faith, it found a clear violation of
5    Penal Code section 1054.1, subdivision (b), which requires that the
     prosecuting attorney disclose all defendants' statements.
6    Nevertheless, the court denied the defense motions to dismiss and
     for a new trial because defendant's constitutional right to a fair trial
7    had not been compromised by <u>Brady</u> error.

8                                    * * *

9    In denying the motion for a new trial, the trial court observed that
     the jury's verdicts were consistent with the defense on all counts
10   involving Donna.  The jury acquitted defendant of attempted
     murder, kidnapping, and assault with a deadly weapon against
11   Donna.  The defense conceded that defendant committed
     misdemeanor false imprisonment.

12

13   (Opinion at 5-6, 8.)

14          Petitioner argues that the prosecutor's failure to disclose the 33 audiotapes in a

15   timely manner denied him the opportunity to investigate and fully prepare a defense.  He argues

16   that: (1) by the time the existence of the tapes was revealed, defense counsel had conducted an

17   aggressive cross-examination of Donna and Meco, thereby turning them into hostile witnesses

18   for a possible retrial; (2) the defense had insufficient time to make full use of the tape recordings

19   in adapting an appropriate trial strategy; and (3) without the tapes, cross-examination of the

20   state's witnesses had been compromised.  Petitioner argues in particular that the tape of the

21   August 20, 1998 conversation between himself and Donna, described above by the California

22   Court of Appeal,  provides evidence which could have been used to cross-examine Donna, Meco,

23   and their grandmother.  In this regard, he explains:

24          For example, appellant asked Donna at the August 20, 1998 jail
            visit how Meco was doing, and Donna answered that Meco wanted
25          to see appellant.  (Clerk's <u>First Augment</u> to Transcript on Appeal,
            hereinafter "CFATA" at p. 4.)  Donna also told appellant that her
26          grandmother told Meco to stop talking to the newspapers about the

                                      7

case, implying that it would hurt appellant at trial.  (CTATA 5.)
This information could have also been used to impeach the
testimony of Donna Halvorson, Donna and Meco Shulte's
grandmother, who testified at trial.  (RT 647-650.)  Mrs. Halvorson
cannot be said to have testified in a friendly way toward appellant,
but was expressing a positive attitude toward appellant shortly after
the events; i.e., before Donna's August 20, 1998, jail visit, which
was nine days after the events.

In the August 20 tape when Donna Schulte learned from appellant
that he had gone to the cemetery for three nights in a row before
August 11, 1998, she asked him why he did not come and ask her
for help.  (CTATA 8.)  However, in her trial testimony Donna
expressed surprise that appellant came to her home on August 11.
The surprise at appellant's appearance at her home does not seem
to comport with Donna's solicitous invitation for appellant to seek
her help whenever he wanted it.  When appellant said to Donna in
the jail visit that he was out of his mind, Donna replied that she
had never before seen him like he had been on August 11.
(CTATA 10.)  Donna's feelings about the true state of appellant's
condition were not available to the defense, because at trial she did
not freely volunteer such information.

In the August 20 tape Donna said to appellant that she had never
been afraid of him, and acknowledged that the cemetery was a
place they regularly hung out.  (CFATA 11.)  But in her trial
testimony about her reactions when they reached the cemetery, and
how she had to be yanked from the truck, and how appellant had
pushed her once she was out of the truck, she conveyed the feeling
that she was definitely afraid of appellant.

Also on the August 20 jail tape when appellant tells Donna that he
should not be in jail, Donna replies, "We're trying to get you
somewhere else."  (CTATA 13.)  Donna never volunteered at trial
that she, and unidentified ("We're") other persons, were trying to
obtain appellant's release from jail.

(Addendum to Pet. (Addendum), § 1 at 32-34.)  Petitioner also argues that he was forced to not

testify at trial because of the tardy disclosure of the tape recordings.  In support of this argument,

petitioner quotes from his trial counsel's declaration submitted in support of the motion for new

trial, as follows:

3.  Prior to this new discovery [of 33 audio jail visit tapes], I felt
confident in letting the defendant testify.  He had no felony
convictions, was articulate and I felt that his testimony regarding
the incidents at the hospital could be very beneficial in establishing

/////

8

> doubt as to intent and could portray the defendant in a very
> sympathetic light.
>
> 4.  After reviewing the tapes it became quite apparent that detailed
> analysis and planning would be required in order to call the
> defendant with any level of confidence.  The time required was not
> available and I concluded that the most prudent course was to
> advise the defendant not to testify, as it would allow the district
> attorney to cross-examine the defendant on any number of points
> that I could not hope to prepare the defendant to meet.

(Addendum, § 2 at 39-40.)

In rejecting petitioner's claim in this regard, the California Court of Appeal noted

that only four of the thirty-three audiotapes in question involved conversations between petitioner

and Donna Schulte at the jail.  (Opinion at 7.)  Petitioner did not argue on direct appeal, and does

not argue now, that any information on the other twenty-nine tapes would have had an impact on

his trial strategy.  Of the four relevant tapes, the defense chose to play only one for the jury: the

conversation which took place on August 20, 1998.  (Id. at 8.)  As found by the state appellate

court, and confirmed by a reading of the transcript of the August 20 tape recording, that

conversation between petitioner and Donna Schulte contained both inculpatory and exculpatory

evidence.  (Id. at 8; Answer, Ex. 6.)  After noting these facts, the state appellate court narrowed

the issue presented on appeal as follows: "whether the four tapes and the August 20th tape in

particular, were material.  In other words, did the late disclosure of these tapes undermine

confidence in the jury's verdicts?"  (Opinion at 8.)[2]

The state appellate court concluded that late disclosure of the relevant tapes did

not result in a due process violation, reasoning as follows:

> Ultimately, the jury found the false imprisonment was committed
> by fear or menace and with the use of a firearm.  Defendant fails to
> point to any evidence on any of the tapes that arguably could have
> mitigated the finding of felony false imprisonment.  If, as
> defendant concedes, he was guilty of misdemeanor false

---

[2]  A transcription of the August 20 tape has been filed with respondent's answer.  None of
the other tapes or their transcription has been filed with the court.

1

> imprisonment, the findings that he personally used a firearm and
> invoked fear or menace are inescapable. Both Donna and Meco
> testified that defendant held a gun to Donna's temple, conduct that,
> even if it was not fear producing, was certainly menacing. While
> defendant argues eloquent generalities, he simply cannot make the
> case that, if the tapes had been disclosed earlier, there is a
> reasonable probability he would have been acquitted of felony false
> imprisonment or the jury would have found he did not personally
> use the gun.

2

3

4

5

6  (Id. at 8-9.) With regard to petitioner's argument that the trial court erred in denying his motion

7  for new trial, the state appellate court concluded as follows:

8

> The trial court, having listened to the testimony of all the witnesses
> as well as the tape, expressed its confidence in the jury verdicts and
> reached the conclusion there was no reasonable probability that a
> timely disclosure would have achieved any better outcome for
> defendant. From our vantage point, the tapes themselves were of
> marginal probative value, and the defense's success at exploiting
> the prosecutorial misconduct inured to defendant's benefit. We,
> therefore, can find no abuse of discretion and must affirm the trial
> court's denial of the motion for new trial.

9

10

11

12

13  (Opinion at 11.)

14            In Brady v. Maryland, the United States Supreme Court held "that the suppression

15  by the prosecution of evidence favorable to an accused upon request violates due process where

16  the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

17  of the prosecution." 373 U.S. at 87. See also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir.

18  2003). The duty to disclose such evidence is applicable even though there has been no request by

19  the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment

20  evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985).

21  There are three components of a Brady violation: "[t]he evidence at issue must be favorable to

22  the accused, either because it is exculpatory, or because it is impeaching; the evidence must have

23  been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

24  Strickler v. Greene, 527 U.S. 263, 281-82 (1999). See also Banks v. Dretke, 540 U.S. 668, 691

25  (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005). In order to establish prejudice,

26  petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial

would have been different if the suppressed documents had been disclosed to the defense."

Strickler, 527 U.S. at 289.  "The question is not whether petitioner would more likely than not

have received a different verdict with the evidence, but whether "in its absence he received a fair

trial, understood as a trial resulting in a verdict worthy of confidence." (Id.) (quoting Kyles v.

Whitley, 514 U.S. 419, 434  (1995)).  See also Silva, 416 F.3d at 986 ("a Brady violation is

established where there 'the favorable evidence could reasonably be taken to put the whole case

in such a different light as to undermine confidence in the verdict.'")  Once the materiality of the

suppressed evidence is established, no further harmless error analysis is required.  Kyles, 514

U.S. at 435-36; Silva, 416 F.3d at 986.  "When the government has suppressed material evidence

favorable to the defendant, the conviction must be set aside."  Silva, 416 F.3d at 986.

After a review of the record in this case, this court concludes that the state courts'

decision that there was no prejudice resulting from the prosecutor's Brady violation is not

contrary to or an unreasonable application of federal law and should not be set aside.  Although

the disclosure of the audio tapes occurred after the prosecution had called Donna Halvorson,

Donna Shulte and Meco Shulte as witnesses, the defense case had not yet commenced.  The trial

court granted a one-week continuance for the defense to review the belated discovery, assimilate

the information contained on the tapes and to make use of the benefits of any evidence contained

therein.  The defense ultimately elected to play the August 20 tape for the jury and apparently

decided that the other tapes contained nothing of significance.  Accordingly, the jury was

apprised of all evidence the defense deemed relevant.  Petitioner has failed to substantiate his

claim that he was forced not to testify in his own defense because of the late disclosure of the

tapes.  Given the fact that petitioner's voice appeared on only four of the tapes, seven days would

appear to have been a sufficient amount of time to digest the evidence and adjust the defense

strategy appropriately.  In fact, defense counsel's request for the seven day continuance was

granted by the trial court.  (RT 1214.)  When the trial court denied the defense motion to dismiss

based upon the Brady violation, defense counsel did not ask for any additional time to consider

the belatedly produced tapes or to conduct discovery and engage in additional trial preparation in light of their disclosure.  (See RT 1271-85.)  To the contrary, defense counsel gave every indication he was prepared to proceed.  (Id.)  See United States v. Smith, 292 F.3d 90, 101-03 (1st Cir. 2002) (in a delayed discovery disclosure case where defense counsel was granted a three-day continuance of his cross-examination of the witness in question and did not complain that the continuance was insufficient to adequately prepare, the defendant's later claim of prejudice attributable to the late disclosure is either not preserved or undermined), cert. denied 538 U.S. 933 (2003).  Finally, trial counsel's declaration in support of petitioner's allegation in this regard is vague, unspecific and insufficient to establish prejudice.  Smith, 292 F.3d  at 103.

Of course, the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case "cannot be overemphasized."  Silva, 416 F.3d at 986.  However, in this case petitioner's counsel could have recalled Donna and Meco Schulte and Mrs. Halvorson to the witness stand if he believed the tape recordings contained relevant impeachment evidence.  See United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir. 1988) (finding no Brady violation even though evidence impeaching government's principal witness was not disclosed until after government concluded its case-in-chief because defense counsel was allowed to recall witnesses following the disclosure and introduced some of the evidence as defense exhibits).   "As long as ultimate disclosure [of discovery] is made before it is too late for the defendant[] to make use of any benefits of the evidence, Due Process is satisfied."  United States v. Scarborough, 128 F.3d 1373, 1376 (10th Cir. 1997) (quoting United States v. Warhop, 732 F.2d 775, 777 (10th Cir. 1984).  See also United States v. Anderson, 391 F.3d 970, 975 (9th Cir. 2004) (no Brady violation by government's delay in identifying two witnesses where the defense secured the appearance of the witnesses and had the opportunity to recall other witnesses who could possibly have been impeached thereby); United States v. Gamez-Orduno, 235 F.3d 453, 461-62 (9th Cir. 2000) (due process violation due to delayed disclosure cured by granting the defense a continuance to

prepare); <u>United States v. Alvarez</u>, 86 F.3d 901, 905 (9th Cir. 1996) (no prejudice to defendant from government's untimely production of officer's rough notes reflecting discrepancies with his testimony where the defense eventually received the rough notes and was able to fully cross-examine the officer about the discrepancies in his report); <u>United States v. Manning</u>, 56 F.3d 1188, 1198 (9th Cir. 1995) (no prejudice shown resulting from government's production of a letter to the defense after the trial commenced).  <u>Cf.</u> <u>Silva</u>, 416 F.3d at 990-91 (prosecutor's failure to disclose at any time during trial evidence of an agreement with a star government witness where such evidence could have seriously undermined mental competence of witness found to constitute a due process violation entitling petitioner to habeas relief).

The court finds unpersuasive petitioner's argument that his trial counsel could not conduct an effective recross-examination of the prosecution witnesses following the belated discovery of the tapes because they had become hostile witnesses.  The trial court found that petitioner's trial attorney would not be hampered in recalling those witnesses if it was otherwise appropriate in order to present a full defense.  (RT at 1275-77.)  The record reflects no reason to doubt the trial court's assessment in this regard.

Finally, as discussed by the state appellate court, there is no evidence in the record suggesting that disclosure of the tape recordings at an earlier time could reasonably have put the case against petitioner in such a different light so as to undermine confidence in the verdict.  <u>See</u> <u>Kyles</u>, 514 U.S. at 435; <u>Silva</u>, 416 F.3d at 986.  Petitioner's convictions on charges of false imprisonment with the use of a firearm, second degree robbery, assault with a deadly weapon, and second degree burglary with the use of a knife were all supported by overwhelming evidence.  As the state court of appeal observed, the defense successfully exploited the prosecutor's delayed disclosure of the tape recordings in obtaining acquittals on the attempted murder, kidnapping and felony assault charges.  Ultimately, petitioner has not shown that earlier disclosure of the tapes would have affected the result of his trial in any way.  Accordingly, the state courts did not

/////

commit federal constitutional error in rejecting petitioner's argument that his convictions were

tainted by the <u>Brady</u> violation.

### B.  Griffin Error

Petitioner's next claim is that his rights to due process and a fair trial were

violated when the prosecutor commented during closing argument on petitioner's failure to

testify, in violation of <u>Griffin v. California</u>, 380 U.S. 609 (1965).  Petitioner also argues that the

trial court erred when it denied his motion for new trial on this basis.

The California Court of Appeal described the background to this claim as follows:

> Toward the close of his argument, the prosecutor stated: "And the last piece of evidence that I want to discuss is the audio tape.  We heard the visit between Heath Cain and Donna [S.] just nine days after the incident.  As his Honor told you, you're not to consider the statements on that tape for the truth of the matter, but for the state of mind.  But we all heard those statements.  And you know something, it's too bad, like all the other witnesses, I can't cross-examine the video tape – I'm sorry, that's – I meant audio tape, too bad I can't cross-examine an audio tape.  It would be nice to ask that audio tape some questions."

> The court interrupted the argument, dismissed the jurors for lunch, and immediately queried the prosecutor.  The prosecutor denied that his comments would leave the jurors with the impression he was commenting on defendant's failure to testify.  The court responded, "But counsel there are two participants in that conversation, Mr. Cain and Miss [S.].  You've had ample opportunity to examine Miss [S.] about it and you could have called her back.  So what do you think the reasonable inference is when you say "I wish I could cross-examine that audio tape.'"

> There was additional discussion and admonition.  The prosecutor continued his argument in the same vein but substituted a phantom stenographer he wished he could cross-examine.  "I think where I left off, I was discussing the audio tape.  Remember this is the conversation where the Judge told you that it is – the evidentiary value of that tape is limited to circumstantial evidence only, and not for the truth of the conversation on that tape.  Okay.  Instead of being an inanimate object, instead of say we have an audio tape, say we have somebody at that conversation there taking longhand about the conversation and that was read to you.  And what questions could I have asked that person regarding the circumstances of this conversation."

(Opinion at 12-13.)

1    After the jury began its deliberations, the trial court heard argument on a defense

2    motion for mistrial based on <u>Griffin</u> error.  (Reporter's Transcript on Appeal (RT) at 1889.)  The

3    trial court found that "there definitely was <u>Griffin</u> error in the sense that there was a comment by

4    the prosecutor which could reasonably be interpreted by jurors to be a reference to a desire by the

5    prosecutor to examine Mr. Cain."  (<u>Id.</u> at 1907.)  However, the trial court concluded that the error

6    was harmless because it was "beyond a reasonable doubt that this improper comment by [the

7    prosecutor] would not affect the outcome in this case."  (<u>Id.</u>)

8    Petitioner argues that the prosecutor's <u>Griffin</u> error was prejudicial because the

9    evidence against him was "very weak in every important aspect," as demonstrated by the jury's

10   acquittal on the charges of attempted murder, kidnapping and assault with a firearm.

11   (Addendum, § 3 at 53-54.)

12   The California Court of Appeal agreed with the trial court that the prosecutor

13   committed <u>Griffin</u> error when he commented on his inability to cross-examine the audiotape.

14   (Opinion at 1.)  However, the state appellate court concluded that any error was harmless beyond

15   a reasonable doubt because "the prosecution's case was compelling and the defense was weak."

16   (<u>Id.</u> at 1, 13.)  The court explained its reasoning as follows:

17       Defendant insists the evidence of guilt was not overwhelming, as
         evidenced by the jury's split verdict.  He is wrong.  The evidence is
18       indeed overwhelming on those counts of which he stands
         convicted.  As discussed at length ante, there is simply no credible
19       evidence he did not commit burglary, robbery, and assault against
         the pharmacist.  Nor is there any reasonable possibility the jury
20       could have acquitted him of false imprisonment or the personal use
         of a gun since he held Donna at gunpoint.

21
         We agree with the trial court's assessment of the presence of
22       <u>Griffin</u> error and its finding that the constitutional transgression
         was relatively minor.  Unlike <u>Guzman</u>, <u>supra</u>, 80 Cal.App.4th
23       1282, wherein the prosecutor throughout his argument alluded to
         the defendant's failure to testify and augmented that argument with
24       visual illustrations, the prosecutor here made brief reference to his
         desire to cross-examine the audio tape and tried to minimize the
25       potential for the jury to draw the prohibited inferences.  As a
         consequence, we conclude the constitutional error was minor and,
26       when measured against the mountain of evidence against

15

1                 defendant, any potential for affecting the outcome evaporates.  In

                sum, the prosecutor's <u>Griffin</u> errors did not compromise

2                 defendant's right to a fair trial.  There was no prejudicial error.

3 (<u>Id.</u> at 14-15.)

4         The Fifth Amendment prohibits a prosecutor from commenting to the jury

5 regarding the defendant's failure to testify at trial.  <u>See Griffin</u>, 380 U.S. at 615.  A prosecutorial

6 comment in argument runs afoul of the rule "if it is manifestly intended to call attention to the

7 defendant's failure to testify, or is of such a character that the jury would naturally and

8 necessarily take it to be a comment on the failure to testify."  <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809

9 (9th Cir. 1987).  However, relief is to be granted on such a claim only "'where such comment is

10 extensive, where an inference of guilt from silence is stressed to the jury as a basis for the

11 conviction, and where there is evidence that could have supported acquittal.'"  <u>Id.</u> (citations

12 omitted).  <u>See also Beardslee v. Woodford</u>, 358 F.3d 560, 587 (9th Cir.), <u>cert. denied</u> ___ U.S.

13 ___, 125 S. Ct. 281 (2004); <u>United States v. Olano</u>, 62 F.3d 1180, 1196 (9th Cir. 1995); <u>Jeffries</u>

14 <u>v. Blodgett</u>, 5 F.3d 1180, 1192 (1993).  Conversely, relief will not be granted where the

15 prosecutorial comment is a single, isolated incident, does not stress the inference of guilt from

16 silence as a basis for the verdict and is followed by a curative instruction.  <u>Lincoln</u>, 807 F.2d at

17 809.

18         This court agrees with the state appellate court assessment that no error of

19 constitutional magnitude occurred here.  As explained by the California Court of Appeal, the

20 evidence with respect to the crimes of which petitioner was convicted was overwhelming.  In

21 fact, defense counsel conceded during closing argument that petitioner was guilty of

22 misdemeanor false imprisonment because "the undisputed testimony is that he made her get out

23 of the truck and he pinned her against the truck for a few seconds." (RT at 1852.)  In addition,

24 the jury was instructed as follows:

25                 A defendant in a criminal trial has a constitutional right not to be

                compelled to testify.  You must not draw any inference from the

26                 fact that a defendant does not testify.  Further, you must neither

> discuss this matter nor permit it to enter into your deliberations in any way.
>
> In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him.  No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element.

(CT at 712-13.)  These instructions clearly informed the jurors that they could not treat petitioner's silence as substantive evidence of guilt, that they were not to draw any negative inference from petitioner's failure to testify and that they could not penalize petitioner for failing to fill in material gaps in the evidence.  Further, the prosecutor's comments in his closing argument did not ask the jury to draw an adverse inference based on petitioner's election not to testify.  Given the circumstances, petitioner has failed to show prejudicial error by virtue of the prosecutor's comments or the trial court's failure to grant petitioner a new trial on the basis of Griffin error.  Accordingly, petitioner is not entitled to relief on this claim.

C. Jury Instruction Error

Petitioner's next claim is that the trial court's refusal to instruct the jury with a requested special ("pinpoint") instruction denied him the right to have the jury determine every material issue presented by the evidence.  Specifically, he argues that the lack of a pinpoint instruction prevented the jury from fully evaluating his defense with respect to the charge of assault with a deadly weapon on the pharmacist. (Pet. at 6 ½; Addendum, § 4.)  Petitioner contended at trial that he did not intend to injure the pharmacist, but only intended to frighten him away from the pharmacy so that petitioner could gain access to medications.  Petitioner argues that none of the jury instructions given at trial adequately covered this theory of defense and that the court's refusal to give the requested pinpoint instruction "left the jurors with no guidance on how to evaluate or apply the defense evidence or the argument of counsel on [petitioner's] motive to frighten or distract." (Addendum, § 4 at 69.)

/////

1       The state court record reflects that petitioner's jury was instructed with CALJIC

2  No. 9.00, as follows:

3          In order to prove an assault, each of the following elements must
           be proved:
4
           1. A person willfully committed an act which by its nature would
5          probably and directly result in the application of physical force on
           another person; and
6
           2. At the time the act was committed, the person intended to use
7          physical force upon another person or to do an act that was
           substantially certain to result in the application of physical force
8          upon another person; and

9          3. At the time the act was committed, the person had the present
           ability to apply physical force to the person of another.
10
           "Willfully" means that the person committing the act did so
11         intentionally."

12  (CT at 742.)  Petitioner requested an additional instruction, Forecite Instruction Number F 9.00a,

13  which provides as follows:

14         The defendant may not be convicted of assault if [he] [she]
           intended to [insert act relied upon by defendant; e.g., shoot above
15         the victim's head] and if [his] [her] intent was not an attempt to
           apply physical force against the victim but was an attempt to [insert
16         defendant's motive; e.g., to frighten or distract].  If after
           consideration of all the evidence you have a reasonable doubt that
17         the defendant intended to apply physical force against the victim
           you must find [him] [her] not guilty.
18

19  (Addendum, § 5 at 62; Opinion at 15.)  At the hearing on jury instructions held by the trial court,

20  petitioner's counsel argued that the requested pinpoint instruction "just clarified what is already

21  within the assault instruction."  (RT at 1680.)  The trial court declined to give the instruction

22  requested by the defense, finding it "as being covered by other instructions."  (Id. at 1681.)

23         The California Court of Appeal agreed with the trial court, explaining that the

24  CALJIC No. 9.00 instruction given at petitioner's trial, was meant

25         to apply to a situation where, as here, the defendant contends he
           did not intend to commit an act, the natural consequence of which
26         is to result in physical force against a person.  Whether he intended

18

> to frighten, distract, or annoy the victim does not matter; each is a state of mind incompatible with a finding that the defendant intended to commit an act that would result in physical force.  The proposed instruction was merely a clarification of CALJIC No. 9.00.
>
> A trial court may properly refuse to give requested instructions when they are repetitive of instructions already given.  (People v. Turner (1994) 8 Cal.4th 137, 203.)  The trial court did not err, therefore, in refusing defendant's mere clarification.  The essence of the requested instruction was included in the instructions given by the court.

(Opinion at 16.)

In general, a challenge to jury instructions does not state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail on such a claim petitioner must demonstrate that the "ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'"  Middleton v. McNeil, 541 U.S. 433, 437 (2004) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F. 2d at 317 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  See also Middleton, 541 U.S. at 437.  Where, as here, the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

/////

1    Petitioner has failed to sustain his "heavy burden" of demonstrating a miscarriage

2    of justice based upon the trial court's failure to give the requested pinpoint instruction.  A review

3    of the record reflects that petitioner's trial counsel was able to fully develop petitioner's theory of

4    the defense that he did not intend to harm the pharmacist.  Counsel argued this theory extensively

5    to the jury in his closing argument.  (RT at 1847-50.)  He also produced witnesses for the jury's

6    consideration, including the pharmacist, who testified that petitioner stated he did not intend to

7    harm anyone.  (Id. at 979, 1318.)  CALJIC Instruction No. 9.00, along with the evidence

8    produced at trial, provided a basis for petitioner to argue that he did not harbor the requisite

9    intent to be convicted of assault with a deadly weapon because he only intended to frighten the

10   pharmacist.  The lack of a pinpoint instruction did not prevent petitioner from presenting his

11   theory of defense or otherwise render petitioner's trial fundamentally unfair.  Accordingly,

12   petitioner is not entitled to relief on this claim.

13       D.  Prosecutorial Misconduct

14       In his final argument, petitioner contends that his right to due process and a fair

15   trial were violated when, during voir dire, the prosecutor improperly made an "assertion of

16   official authority which misled the jury as to the burden of proof."  (Addendum, § 6 at 73.)

17   Petitioner specifically objects to the following comments to the prospective jurors made by the

18   prosecutor:

19       MR. JANKOWITZ (the prosecutor): Good afternoon, Ms. [juror].
         And you understand my burden is to prove the defendant guilty
20       beyond a reasonable doubt?

21       THE JUROR: Yes.

22       MR. JANKOWITZ: And I agreed to that burden when I took an
         oath as District Attorney.  What I say, for example, I had not
23       proved the the defendant guilty beyond a reasonable doubt.  Would
         it be harder for you to find him not guilty if he had used a gun as
24       opposed to using a club or knife?  Would you hold me to a
         different burden?

25       THE JUROR: No.

26   /////

1    (<u>Id.</u> at 73; Reporter's Augmented Transcript on Appeal (RTA) at 265.)  Petitioner argues that

2    "the implication from this statement is that [the prosecutor] would not try to convict [petitioner]

3    if he could not prove him guilty beyond a reasonable doubt."  (Addendum, § 6 at 75.)  Petitioner

4    contends that the prosecutor was attempting to "improperly influence the jury."  (<u>Id.</u>)

5          A criminal defendant's due process rights are violated if prosecutorial misconduct

6    renders a trial fundamentally unfair.  <u>Drayden v. White</u>, 232 F.3d 704, 713 (9th Cir. 2000)

7    (quoting <u>Darden v. Wainwright</u>, 477 U.S. 168, 183 (1986)).  According to the Supreme Court,

8    "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

9    fairness of the trial, not the culpability of the prosecutor."  <u>Smith v. Phillips</u>, 455 U.S. 209, 219

10   (1982).  Thus, the federal habeas court must distinguish between "ordinary trial error of a

11   prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional

12   due process."  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 647-48 (1974).  <u>See</u> <u>also</u> <u>Johnson v.</u>

13   <u>Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995).   In order to determine whether a prosecutor engaged in

14   misconduct, it is necessary to examine the entire proceedings and place the prosecutor's remarks

15   in context.  <u>See</u> <u>United States v. Robinson</u>, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment

16   must be examined in context. . . .");  <u>Greer v. Miller</u>, 483 U.S. 756, 765-66 (1987); <u>Williams v.</u>

17   <u>Borg</u>, 139 F.3d 737, 745 (9th Cir. 1998).  Relief on such claims is limited to cases in which the

18   petitioner can establish that prosecutorial misconduct resulted in actual prejudice.  <u>Johnson</u>, 63

19   F.3d at 930 (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993)); <u>see</u> <u>also</u> <u>Darden</u>, 477

20   U.S. at 181-83.   In this vein, prosecutorial misconduct violates due process when it has a

21   substantial and injurious effect or influence in determining the jury's verdict.  <u>See</u> <u>Ortiz-</u>

22   <u>Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996).

23          The California Court of Appeal rejected petitioner's argument in this regard,

24   reasoning as follows:

25         The prosecutor's isolated reference to his oath of office was neither
          deceptive nor reprehensible.  The trial court found the prosecutor's

26         remark did not create any fundamental lack of fairness or prejudice

> to defendant.  We agree.  The prosecutor may have inflated his
> credibility, but he did not jeopardize defendant's right to a fair
> trial.  The question posed during voir dire simply does not rise to
> the level of reprehensible conduct necessary to upset a jury verdict.

(Opinion at 17.)  The state appellate court's decision with respect to petitioner's claim of

prosecutorial misconduct is not contrary to or an unreasonable application of the federal due

process principles set forth above.  The prosecutor's brief reference to his oath of office did not

render petitioner's trial fundamentally unfair.  Accordingly, petitioner is not entitled to relief on

this claim.

        For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

application for a writ of habeas corpus be denied.

        These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 30, 2005.


                                    _____
                                    DALE A. DROZD
                                    UNITED STATES MAGISTRATE JUDGE

DAD:8:cain1191.hc